Koeppel v. District Board of Trustees Good morning. May it please the court. My name is Kimberly Lau for the appellant, Jeffrey Koeppel. On August 25, 2014, the state of Florida through Valencia College punished Mr. Koeppel for exercising his right to free speech through a college disciplinary hearing. The speech at issue involved text messages that Koeppel sent to Jane Doe in one night after a telephone argument and after her ex-husband, not a student, verbally threatened to kick Koeppel's butt and get him kicked out of school. The messages at issue were exchanged between two adults over the summer when no classes were in session in their private homes taking place off campus miles away. But that's the troublesome issue in this case and so I'm glad you went right to it. But they both were still at that moment enrolled in school and there was a intercession because there was a new semester about to start. But there's no doubt that they both still were enrolled and presumably, I don't know when tuition gets paid, but had they paid their tuition by that time for the next semester yet, do you know, or does the record show? The record does not show that aspect of the facts. But there's no doubt that they were still enrolled and it was between semesters no different really than a Christmas break or a Thanksgiving break or anything. Is that right? They were in between semesters and no classes were in session. That's correct. And the Tinker Standard though requires that there be a material and substantial disruption in the schools. It does. It does. But it also goes on to say it addresses conduct of students quote in class or out of it. Your Honors, however, the material and substantial disruption standard still needs to be met and that was not met here in this content of the text. So you're admitting that out of class conduct can be covered. But you're somehow saying that this particular out of class conduct was not so disruptive as to impact the educational environment at the school. That's your point. I'm arguing that as well as the fact that their own policies state that they only can take off campus jurisdiction if it adversely affects the college community. This had nothing to do with school. I know that these arguments have often not been successful for the universities. But do you agree that if the university were to allow sexual harassment to be undisciplined and indeed unfettered on a campus that that would adversely affect the educational quality of the university? As a general proposition, yes. So the university couldn't say, look, we're trying to teach you, but you guys and gals you can have whatever sexual aggression and stalking on other people that you want. That would impact the educational quality. So if the university has the ability to govern it, then surely they should have a policy that does it. And what is it about this policy that you think is improper? I know you're saying it's vague and it's ambiguous and a bunch of other things, but does this case really then devolve down to vagueness and overbreadth? We argue that it's overbroad and vague as well with respect to the policies themselves. It's shown that Dijon policy in the Temple case, it's very similar to the Valencia policy at issue here as opposed to the one that was analyzed by the district court. So what if the policy wasn't vague in your opinion? What if the policy said, among other things, you can be disciplined if you send email messages to a co-student, whether those messages are sent in class or out of class or during spring break or between semesters, because that other student will be sufficiently impacted by the stalking, that if we allow that policy, the whole educational system will be impaired. If the policy was written that way, would you disagree that the university could have done what it did here, the college? The policy that we're dealing with does not have any limiting construction. So I'm just trying to decide what it is about this policy that you find inadequate. I think there's four factors and I think you make a good case that several of those factors may be overbroad, but they're not all overbroad, I don't think. They are overbroad in the fact that there are over-inclusive terms being used in many of the- But wouldn't you have to prove that all factors were overbroad because the discipline was imposed for violating A, B, C, and D? That wasn't the numbering, but all four of those factors. And if we find that one or two of those factors were valid, could the university's decision be affirmed? No, Your Honor, because they would still have to go through the analysis and all the elements, for each of the four policies that were at issue, and they did not. So if we found one factor overbroad, but the other is not, and we found that there was evidence on the non-broad factors, you think we still would have to reverse? Yes, but they are all overbroad and or vague because they do not include an actual definition as to the lewd policy. I'm just trying to decide, do we have to agree with you that all four elements, four prongs that were addressed here, you know, the stalking, the lewd behavior, the physical threatening and the other one, do we have to find all of those overbroad for you to win, or just one of them? You need to find that all of them are overbroad and vague if we win on the as facially unconstitutional. Thank you. That answers my question. Let me go back to what Judge Ebell asked at the beginning, just so that I'm clear. It is not your position that the college or university cannot regulate off-campus conduct to the extent it affects things that happen on campus? No. If student A texts or emails student B off-campus to off-campus threatening student B in one way or the other, whether sexually, physically, or otherwise, does the university have a right to step in and address that? If there were evidence of that threat? Yes. I'm saying if student A sends a threat to student B by text or email, threatens to kill, threatens to rape, threatens to stalk, threatens to harass, you would not dispute that the university would have the right to step in assuming that it had an appropriate disciplinary procedure and mechanism, correct? That's correct. I'm not disputing that. That's not here, though. There were no directed threats to Jane or the Valencia community? There is none found in the record? There were certainly harassment and stalking, electronic social media stalking, whatever you want to call it. Was there not? Your Honors, there has not been a single college case that has been decided to show that there has been any kind of fact scenario that's similar here. But you know that wasn't my question. There was certainly social media harassment and stalking, was there not? There was no harassment here, Your Honor, because they did not go through the elements of their own policies. I'm not talking about their procedures. I'm talking about the facts. All those contacts and the content of the contacts. And what she testified without substantial dispute. That's stalking. Your Honor, she did not testify. I'm sorry. What she put in her complaint and what she told the investigator, the official, the defendant. That's stalking, is it not? If true, that's stalking. Your Honor, not according to their vague policies. I'm not talking about their policy counsel. Answer me. In the common understanding definition of the term, that is stalking, is it not? And that is harassment, is it not? I cannot agree with that position, Your Honor. Really? So somebody can contact a woman who keeps telling him, pleading with him, please stop. I don't want to hear from you anymore. And with the content of these messages and that's not harassment? Your Honor, the messages that you just referenced, please stop, did not happen during the window of time. That the alleged messages that were allegedly offensive. Well, is there any dispute about the texts that were sent? I thought everybody agreed the texts were sent. The only question is what significance ought to be attached to them, right? You are correct. That's not in dispute. It's not in dispute among other things that couples sent to Roe the following, quote, the second class was done. Respect gone. Yeah, I got a right to feel a little used. Damn right, I'm upset at the moment. I wondered if you were a hussy and I guess so. Dressed like a hooker and now act like it. Just sucks I didn't wear you out. Them skinny legs and so on and so forth. Them tiny horse shorts. You don't think that a... Hanging out. That's not harassment. Your Honor, the harassment requires that you need to look to both an objective and subjective view. Which one are we flunking under here? There was no subjective view that she actually felt fearful, threatened or harassed. She didn't. There's no evidence she felt harassed. I thought she pleaded with him. Your Honor, that occurred after the deputy had already talked to him. But it still happened. I mean, it related back to the events that occurred. And he kept contacting her. Your Honors, the only text messages that were issued for Dean Sirubo to actually punish him were based on the messages prior to the deputy contacting him. And he admitted that he did not ask her whether she was fearful, whether she felt threatened. None of that was in the record. What inference would one reasonably draw from the fact that A, she filed a complaint with the sheriff going outside of the context of the school and B, filed a complaint with the dean of students? Why would she do that? Your Honor, the police were... Couldn't one reasonably infer from that, at least at the outset to commence an inquiry, that she was concerned, upset, threatened, put it any way you want. She was sufficiently troubled personally to complain in two wholly different fora. Could not a dean of students infer from that that she was subjectively troubled by what had happened here? He could not have, if he was given evidence that there were other reasons why she had raised the complaint to begin with, to walk it into the Valencia College office, namely because of her ex-husband's behest and because the call to the sheriff was not from herself. It was by her ex-husband, which was put into the record as well. Did she sit down with the sheriff and lay out all this stuff? Is it the boyfriend who speaks to the sheriff or Jane Roe? It was the boyfriend. Jane Roe never speaks to the sheriff? That was not the first call. That's not my question. We'll do much better if I just get a simple answer to a simple question. Did Jane Roe speak with the sheriff? She did indeed, at some point later, yes. After the deputy responded to the boyfriend's phone call, he went and talked to Jane. Then, after that, he recommended that your client quit contacting Jane. Then your client immediately started contacting Jane some more, and Jane told Coppel twice, stop calling me, do not have any contact with me, and he persisted. That's not harassment. Your Honors, the policy is clear that they did not have jurisdiction . . . I'm not talking about policy. I'm talking about is that harassment? Does that invade her rights? It doesn't invade a woman's rights, or man's rights for that matter, for somebody to keep calling him through the night on one occasion and making all these, which he admits, lewd contact, lewd comments that are sexual in an offensive or rude way. That doesn't violate or invade her rights. No, Your Honor, because they're two adults, and she continued to engage him as well. This was not a one-sided conversation. She asked, Clark, is that your position? No, it is not my position. I am saying that she also . . . What was she supposed to do? Turn off the cell phone. Did she not tell him, leave me alone, don't call me, and don't text me anymore? Isn't that undisputed in this record? She did that at some later point. Yes, you are correct. And did he not proceed to speak with her still further after she said, leave me alone and stay away from me? Did he honor that request from her? He responded to her. So that's a no. He responded to her message, right. Can I ask just a factual question? Was the Dean Rowe complaint sworn or unsworn? Unsworn. Unsworn. Okay. Thanks. And she was not available for cross-examination? No. Was there evidence that she was not available, or simply that she wasn't . . . I mean, they had already had her complaint, and that Mr. Copel didn't ask to have her come in. Mr. Copel never . . . He never made a request for her that was denied, did he? He had no opportunity to have the request made because he was directly told by the Dean of Students that she was not going to be attending. He did not have that opportunity. But he was there. He did have an opportunity to say, well, I object. I want a cross-examiner. He never said that, did he? He did not know that he could. In his declaration, Mr. Copel says that he did not know that he could actually ask him to do that. Declaration in the district court. That is correct. Well, that may have just been a misunderstanding of his, of the law, then, because I think that there's precedent out there that says that the due process would have given him a right to confront accusers if he wanted to assert it. So who bears the responsibility if he is mistaken about his legal rights? The school does, Your Honor. So you're thinking there's a Miranda right, a Miranda obligation of the school to advise him of his constitutional rights at such a hearing? They are aware of what his rights would be. It's notice and an opportunity to . . . Yeah. So, I mean, this is a very important point. I don't think it's really been addressed in the courts before, but you are asking us to say, and it might be determinative of the outcome if you're right, you're asking us to say that the school board has a Miranda obligation to advise an accused of his constitutional rights. I'm saying that that burden cannot be put on a student who is going through a student discipline process to understand what his constitutional rights are, including when there are ex parte statements that are being made to the dean of students that are then going to be unchallenged and remain accepted as true without the opportunity to . . . Okay. Thank you. To defend. Let me ask you the question this way. What facts were in dispute here as opposed to what inferences one might reasonably draw from the facts? I understand you say that accepting everything they say is true in the text, it doesn't fall within the domain of anything that the university can regulate. I understand that you say that at any event, it's protected speech. I understand that anyway, that you say that their rules and regulations violate the First Amendment both on grounds of overbreath and vagueness, and I understand you to say that it violates both procedural and substantive due process, and I understand you to say that it violated Title IX as well, but I'm asking a different question. I'm just asking a pure fact question. What, if any, facts were in dispute as opposed to what inferences or spin one would have put on those facts? Whether or not Jane was actually fearful or felt threatened, whether there were any direct threats made, there was no dispute that text messages were sent to her. Well, no, but whether it's a direct threat or not is a characterization that one would put on, but we know what was said because we have the texts themselves. So the question is how we construe or interpret, and I understand your position to be that those texts do not yield a fair conclusion, even an inference that there was a threat or that she was subjectively fearful. It's not what I'm asking. I'm simply trying to find out whether there were basic core building blocks of fact in dispute here, and it looks to me, and maybe I'm wrong about this, and I want you to help me with this in the record, but it looks to me that the facts are not really in dispute. There's no dispute that these texts were sent. There's no dispute that some pictures were sent. There's no dispute that these conversations occurred. There's no dispute at one point that your client threatened to use a firearm on her boyfriend. There's no dispute that she didn't testify but simply filled out an incident report. So what facts are in dispute other than whether she reasonably could have felt threatened or fearful from that, which seems to me to be an inference to be drawn from rather than what was actually said. There's no dispute about what was said here, is there? No. The dispute is whether the actual definitions of the policy applied, whether there was physical abuse here. Okay, then why would it matter whether there was the opportunity to cross-examine Jane Rowe or not? The question is the spin to be put on it, the interpretation to be given, whether it constitutes something that merits a discipline or not, and the wisdom of the sanction that they imposed. The facts are not in dispute here. This is not the kind of case where she says he did this to me, and he says, I did no such thing. Or she says he forced himself, and he says, no, it was purely consensual, and you have a credibility debate about who do you believe. We don't have that problem here. What we have is how do we interpret and apply essentially an undisputed factual record. Am I right about that? I respectfully disagree. Okay, what am I missing? That's what I'm trying to get you to tell me. You say you respectfully disagree. Tell me what facts were in dispute other than the assertion that she did or did not subjectively feel threatened by this. Whether there was actual physical abuse, whether there was an intent to injure or harm, these are all elements of their policies that they're applying. When someone's good name and reputation is at stake, they're entitled to due process before their name is impugned. That was deprived here in many ways. I thought that there was two facts that had to be addressed. One was, did this cause the student to, did it affect the student's ability to be a productive student in the university? And that, it seems to me, can be well established by the complaint that she filed and the statements that she made. But there has to be a second finding of fact as well. And that is that the university's educational environment was impaired as well. I thought that could be established by the expertise of the disciplinary committee. They were expert about the university environment and that without any other evidence they could make a judgment of whether this fact impacted the university's environment. So it seems to me the two facts of consequences, consequence of the victim, consequence of the university, we have in the record evidence, undisputed record evidence on both of those things. The thing you keep coming back to is we don't know what his intent was. But I'm not sure that as to stalking and so forth, that his intent mattered. And even if it did matter, isn't there more than adequate evidence about how intent could be inferred from the words that he used in the email? So I guess that's kind of a long question, maybe elaborating upon what Judge Marcus was saying. Right, Your Honors. There was no evidence or rationale stated by the committee on what those findings were with respect to how the text messages that were sent to a college-age student that had nothing to do with school. That's a different question. Are you now making a separate argument that there is a constitutional obligation to make more detailed findings than this committee did? I mean, is that the point you're now trying to argue? No, Your Honor. I'm arguing that simply there was no evidence in the record to show that the committee itself had determined that this was adversely impacting the college community. Well, don't we know that by the fact that they disciplined him? I mean, the policy itself talks about the need to protect the university's educational environment. Your Honor, that policy does derive from a very arbitrary and vague understanding of what it is that would adversely affect the college community and is over-inclusive of conduct that can be protected speech. In this case, there was no conduct at all. There probably are some over-inclusive factors, but that's why I asked you when there was four factors and the committee said these four were violated, whether the committee, if we found that one or two of those was valid, if that would be sufficient to uphold the committee's result. I must say I'm a little unclear on your answer on that. I mean, I asked it once. I guess I could ask it again, but I don't . . . I think I'll get the same answer I asked before, so I guess . . . and given the fact that we've used all of your time, I'll not pursue that. Thank you. I want to use a little bit more of it. Are you arguing that the result in this case, given the historical facts and the result, violate the Tinker standard, First Amendment standard of freedom of speech? I'm arguing that the . . . no. I'm arguing that the Tinker standard applies to not be able to have Valencia College actually prescribe this type of behavior that had no material and substantial disruption. That's not what Tinker says. Tinker says, conduct by the student, in class or out of it, which for any reason, whether it stems from time, place, or type of behavior, materially disrupts class work or involves substantial disorder or invasion of the rights of others or invasion of the rights of others, may be punished. In class or out, if you invade the rights of others, your conduct may be punished by the school. They're talking about high school there. Colleges certainly have more license, I would think, to do so. They do, Your Honor. So, Tinker refutes your First Amendment argument, I would think, assuming, as I gather from my colleagues, we all agree, that your client invaded the rights of the complainant. There is no finding of that, Your Honor, in this record. I just found it. No reasonable fact finder could find to the contrary. He admitted lewd, sexually related comments. It's undisputed. After a cop recommended to him he stop doing it, he did it all night long. And she told him to stop. It's also, as I understand it, undisputed that when she first went to the dean of students, he testified in his testimony that she appeared nervous and concerned. And then when he had the later informal conference with her before proceeding, that she said that she appeared concerned again, and she said, what's going to happen? I don't want to be in class with him. That to me sounds like she did say that it was unwelcome, and she didn't want it, and it bothered her, and it meets the subjective standard. And it does relate to whether it interferes with the academic environment, in that it was a, it necessitated a change in the academic environment in order to try to address that. Put her in a different section. In that same deposition, we also asked whether it's possible that the ex-husband's domestic violence toward Jane Doe had actually been a result of that fear and apprehension that she presented with since he walked her into that college. And he said, I'm not going to talk about non-students. Similarly, that is why the gun, alleged gun reference, it was not anywhere near Dean Cerubo's calculation when he decided this case. So no. You say alleged gun. There's no dispute about what was said there, was there? There is. Because he did not threaten to kill anyone. No, there's no dispute about the words. It's the inference or significance that's in dispute. Do I have that right? That's right. Okay. Thank you, counsel. Thank you. Mr. Conigliaro. Tell me I got that right. Your Honor. May it please the court.  With me is Rick Mitchell, and we are here today to discuss a case that's been brought here today on behalf of the Appellees. I'd like to, well, first of all, the briefs raise numerous points. Certainly we stand on our brief with respect to all of the issues that have not been raised here today. But with respect to what's been discussed here today, I'd like to begin with some of the questions that have come from the court. First, with respect to the facts. There are no disputed facts in this case in the sense of what events actually happened, what words were spoken, who went where, or did what. To the extent there is a dispute or disagreement, I hear the other side contending that things should be seen differently or perceived differently. But there is no dispute as to the facts themselves. Well, she says one fact that is in dispute specifically is the subjective state of mind of Jane Roe. But Jane Roe never said in words specifically, I felt threatened by him. That's what she says. And therefore, that is a fact in dispute that is relevant to the determination. Your Honor, I will suggest that we don't need a quote from her about that state of mind for the evidence to be uncontested, that she was concerned, that she was in fear. The police were called. She met with the detective. The detective stated that she was in fear or troubled. The dean had the same observation when the dean met her. The detective stated that there were grounds to press charges and that that was going to happen. And she said, we don't need to do that if Valencia takes care of this. And that's what then happened. A disciplinary proceeding was brought within the school environment. That was handled. And that, from her point of view, took care of it. And that's the only reason why charges were not pressed here. So I would suggest that there is no alternative way to view this. She was distressed. She was in fear. And that's why she went forward and filed the complaint. And that's why the proceeding eventually happened. And that's why charges were not actually brought. Did her affidavit say, I am distressed and in fear? I do not believe so. And it was a statement, Your Honor, signed but not sworn. Right. But I mean, I shouldn't have said affidavit. So that's right. But her statement didn't say, I am in fear or apprehensive. That's my recollection, Your Honor. With regard to... My biggest surprise in reading this and the biggest problem I have with your procedures are that they appear to presume that the complainant is telling the truth. And if you're going to presume that, what's the point of any other process? Respectfully, Your Honor, I would disagree. Jane, we're calling her Jane. Jane was a student. She was known to everyone involved in this process. The school made the decision not to itself bring her into the actual committee hearing. So when I'm talking about a question, Mrs. Saburo, I can tell you those documents in A and B were used in my deliberation as documents. And yes, these documents are taken as true. That's her statement in the formal complaint. They're signed documents. I'm not going to go investigating behind the scenes when I have a witness statement that has been signed in an incident report that has been submitted by our security officers. Then the question, counsel, can't believe what he's hearing, is it your position that complaints never lie? Answer, I think that is speculating. I can't answer that. I can only say that as part of my investigation, I took these things to be truthful, unless it was proved through the course of my investigation proved otherwise, and it wasn't my role to make that determination. But the committee would have to take this as true, would they not, for it to be relevant for their determination since Ms. Rowe was not present? Yes. They assume that they are true. Your Honor, I would add additional context to that, which is that the dean had met with her and that she had been known to them and she had made these complaints. There were many opportunities if there was to be. But he hadn't heard from the complainee. Had he at that point? On the sequence of events, I'm not sure if at that point he met with, had Jane Rowe first and she filed her statement, and then the formal complaint first, I thought. Maybe I've misapprehended this, and I think it's an important point here. I thought she filed a complaint with the dean. The dean then called Mr. Keppel in and spoke to Mr. Keppel. The dean got the incident report, and then the dean lodged the charge with the committee to investigate. Do I have that right or wrong? I believe that's correct, Your Honor. So before he sent the charge to the committee, he heard both from the complainant and from Mr. Keppel at an incident report, which he had filled out as well, one that had come from whoever filled out the, the police, I guess, filled out the incident report. Yes, Your Honor. But he heard from both sides before he sent it on to the committee. And I would add to that, Your Honor. Is that right? Yes, but I do want to add to it that he had heard from Detective Rush who had met with Jane and who had spoken with Mr. Keppel. Right, but before he proceeded to institute the disciplinary proceeding before this committee of others, he heard from both sides in this case. Yes, Your Honor. Yeah, but he didn't say, I heard from both sides and I believed her and not him. He said, these documents are taken as true. I'm not going to go investigating behind the scenes. I took these things to be truthful as part of my investigation. Well, once you assume that one side's story is truthful, there's no real point in an investigation. In this case, Mr. Keppel did not dispute the essential facts that we're talking about here as that, I think, has been acknowledged. The basic facts of what happened, what texts were sent, what calls were made, what communications were had. That's not what the dean said. He didn't say, these facts are undisputed. I talked to both sides and that's what they are. He said, I just assume that these statements by the complainant are true unless Mr. Keppel proves otherwise. I would suggest with more context his statement can be understood to be . . . You understand that if, in fact, you just assume that the complainant was telling the truth, that would be a very serious constitutional problem for you. We acknowledge that that's not the fact here, but had it been, we agree. If he starts out saying, he did it, I believe her, does that create a problem? Is that the equivalent of a probable cause determination? Will you file a charge before a committee that then hears it? I don't know. I'm just asking. I don't think so, Your Honor. This is an academic situation. I understand. The dean has a code of conduct and is trying to enforce its code of conduct on students who have agreed to abide by that code of conduct. This is part of their educational experience. Here, when these complaints from multiple sources were brought to the school, the school took action and the dean decided . . . Let me ask the question this way. I understand that the dean heard from both sides before he lodged the charge with the committee. And I also understand what Judge Carnes has made reference to in the deposition, or at least a piece of the deposition, taken from Cerubo. Is it your position that complainants never lie, object to form answer? I think that's speculating. I can't answer that. I can only say that as part of my investigation, I took these things to be truthful. Unless it was proved through the course of my investigation, proved otherwise, and it wasn't my role to make that determination. What are we to draw from that? First, I would suggest it's not a legal analysis. It is . . . No, and he's not a lawyer. But what's he, in essence, saying? I think he's saying that when these concerns are brought to the school, then the school will take appropriate action. And here the appropriate action was to assemble a committee and to have a proceeding where this would be heard. Mr. Keppel was given every opportunity to dispute that any of these facts were not true. Okay, so then it goes to the committee. And I want to read further from what he says, and Judge Carnes made reference to this as well, talking from the Deposition 112.17, page 213. So there would be no way for them to test the veracity of the statements in A or B, object to the form, answer. Each committee member will make a determination by the information they've heard, by the responding party, and the documents they have in front of them on what sanction should be. The committee members then engage in a conversation, and they reach a consensus on that. They had these documents. So far that suggests the committee was making its own independent determination whether the dean of students started out with a presumption of the truth or not. But then the dean goes on to say in the deposition, they had these documents. They assume they are true. What's he telling us there? That the documents, the texts are true? Or that the underlying complaint is true? I'm just not sure. Are they starting out with the same presumption that she is to be believed, and he is not to be believed unless disproven? No, Your Honor. I think the context of what was being said there is that he was not disputing the facts of what happened in this case. He was not disputing the text. In fact, there's an email in the record that he sent to the dean where he asked that all of the texts be submitted to the committee, and he asked that because he knew that she was not going to be at the hearing. He can assume the facts are true either because he believed her and didn't believe him, or he can assume that the facts are true because the underlying facts are not in dispute. That is to say, the texts are the texts, and what's in dispute is the inference or spin that you put on them. Yes, Your Honor. What I'm asking you is can we tell from this colloquy, and I've read everything he's said, can we tell whether he's starting out with I believed her, not him, because she was more credible than he, or the underlying facts are not in dispute? Because he never says the basic facts are not in dispute. The text is the text. It's there. Nobody's disputing what he emailed, what he texted, what he said. And indeed, your colleague said the only real thing in dispute is the inference and whether they've shown that she had the requisite fear, et cetera. But what is the dean telling us? And when I looked at the procedures, there is no burden of proof in the procedures at all, at least the ones that operated here as opposed to the subsequent ones. Is there a burden of proof that has to be met before they can sanction him? The committee utilized the more likely than not standard considering all the evidence that was presented. How do I know that? I believe it's in the. Where? I didn't see it. Where did the committee say in words or substance, or where does the procedure say in words or substance, we're using a preponderance of the evidence, more likely than not, a greater weight of the evidence, or something like that? I believe it's in the dean's declaration in this case. You mean in his deposition? No, he gave a declaration that was utilized in connection with the summary judgment proceedings. You mean the sworn statement that he gave? He swore an affidavit that he submitted in support of summary judgment. Yes, Your Honor. And in that affidavit, he said we use the preponderance standard basically? Yes. Okay. Let me ask you this. Your 2015 policy, as well as the one before, talks about defining sexual harassment, and you've got, they use the same one in Dijon, Third Circuit. And I suspect you all are like a lot of industries we see. They get contractual language they like, and they spread it around the country. I don't understand this. Unwelcome sexual advance requests for sexual favors, et cetera, which has the purpose or effect, purpose or effect, of unreasonably interfering with individual work or academic performance, et cetera. So if somebody makes a sexual advance which has the purpose of interfering but doesn't interfere, doesn't have that effect, perhaps because it's welcome, perhaps not for some other reason, but that was his purpose, that's sexual harassment. That doesn't make any sense to me. Purpose or effect. Does it make any sense to you? I think it should be read in light of there being both an objective and a subjective consideration. Which is your way of saying, no, it doesn't, but you can take care of it with other languages. That's the deal. Well, that's, I think, the reasonable way to interpret it. Does it matter here? I'm sorry. Yeah. Does it matter in this case? For purposes of the appeal, I believe no. We've got to certainly find one of these paragraphs clearly proper because they're being challenged on over breadth and vagueness and constitutionality and evidence. Do you agree that we could sustain the committee's findings if we find just one of them was okay? Or do you think we need to find all of them have to be okay? I think for them to prevail in their case, they must demonstrate that none of these. That none of them are any good. Tell me why. Because there were four grounds utilized by the committee to impose this discipline. And they found all four? Yes, Your Honor. Let's suppose two were no good. Or three. The argument's one is enough. Yes, Your Honor. Can I move? I mean, may I just go to one other point? I want to go back again to Tinker's statement that we've now read to you many times, we've read to the parties, about this deals with conduct in or out of class. I want to know how far you would carry that. What if two students that had known each other since high school days and lived in Pittsburgh had come to this school? Otherwise, everything was the same except that the harassment occurred during a summer break when they had both returned back to Pittsburgh for the whole summer to work at McDonald's. And at McDonald's, while they were both working this ship, flipping burgers, the male said to the female everything that was said in this email. And she said, I don't want to hear it. Would that be a violation of this conduct that could constitutionally justify an educational impact that would get him kicked out of school? First, let me suggest that all of these hypotheticals are difficult to answer. They are, but to me the most important question in this case is what is meant by in or out of the school and just how far can the school take its jurisdiction? Can Tobago rule the world? And I just want to know how far we can go with it. Well, certainly it can go far enough. Can it go as far as the hypothetical I gave you? I would suggest we probably need more facts under your office. What fact would you need? She would say I'm deeply troubled. It shook me to the core and I don't want to be with this guy again when I come back to school next year. The guy says, though, this was not on the school campus. I mean, in fact, it's not that different from our case in that in both hypothetical and the true facts, it was when the school wasn't in term, they both were out of their term, and the contact, the communication was private between one person and another, not broadcast to the whole school. It had no overarching political or religious content to it, which justifies some of the other cases. So it's not terribly abstract. If she had maintained that she was in fear. Right. If classes were imminent as they were here and they were to share classes. Imminent. So you mean as long as they were enrolled in school, even though maybe let's say they were going to take the whole three months off, and this happened the first week after class summer began, would you think that three months later going back is imminent? And where do you get this word imminent? What case law is that? It's the facts of this particular case. We were in a very small window of time between when the events here happened and when classes were. Are you going to ask us to make a ruling that as long as it's a week, it's okay, but if it's three months, it's not? Are you going to ask us to say that as long as they still live in the same city or in the Miami environs that it's okay, but if it's Pittsburgh, McDonald's, that it's not okay? I just don't know how far Tinker goes in terms of in or out of class. The hypothetical I gave to you just doesn't feel like it's very related to the university. But Tinker tells us where the facts have to end, and the facts have to end with an invasion of the rights of others, with substantial disorder or material disruption. So in my hypothetical, she would say, boy, what that guy did to me or what he said to me, not what he did to anything, but what he said to me in Pittsburgh in that McDonald's so unnerves me, Valencia, that I simply don't feel good going back to school with him, and I think you need to kick him out. Suppose he sexually assaulted her on a trip independent of the school in the dead center of summer in Europe, and the European authorities says, those crazy Americans, we're not going to bother with it. They're already back in the United States. So he doesn't get prosecuted, and the school says, I'm sorry, we don't want anybody in school who does that, and we make a factual determination after giving you your procedural due process rights that you did it. Now, why is it such a stretch to think that the school has the authority to do that? The school doesn't have to admit anyone to school who has a whiff of a rumor of sexual harassment about them. Once you get in school, you've got more rights. But it does not at all shock my conscience to think that if somebody misbehaves outside school and a student's going to have to be in class with that person, the university has the authority, the right, and I would argue the duty to get him out of school. The school would agree. I take it you don't have to go that far to either answer Judge Collins or Judge Ebell. I would have thought your answer would have been, those are not the facts here. We have a very different story. We have two people that were in a biology class together. They were in a study group together, and then he started to send her these e-mails. In which case we would have said that's why we call it a hypothetical. But the difference is that they were not in school. The term had ended. They had gotten their grades, I think, even, if I'm not mistaken. And the e-mail didn't involve school facilities. So to me, I'm just saying I don't quite know how far Tinker reaches and whether it reaches this far. I mean, it's not a hypothetical that we can just ignore because I think the question is, is this sufficiently connected to the university that the university under Tinker can prosecute, can make consequences for this speech? In any event, I think we've addressed it. Let me ask you a fact question, though, about that here. These e-mails occur, these texts, this whole series of incidents occur. Help me with the timing. Between semesters? Yes, Your Honor. How much time between the time these were exchanged and the time the new classes were supposed to start? Just a few weeks, Your Honor. We know that the record would reflect the amount of time. And how far along were each of these students in their studies? There were sophomores, freshmen, juniors. Do we know? I'm not sure that's clear. That is to say from the record. I'm not asking you to tell me what's extrinsic to the record. Thank you. If I could just add one last point harkening back to the questions about the weight of the evidence. I do want to point out. Thirty seconds. Less than that, Your Honor. Thank you. In the Code of Conduct from 2014 in the appeals section, there is reference to one of the potential grounds for an appeal being that the findings were against the weight of the evidence, which is entirely consistent with what the dean explained thereafter. Where would I find that? What page? What number? Your Honor, I'll give you the pacer. It's document 137-1, page 14. It's also page 96 of one of the volumes of the appendix, but I don't have in front of me which volume that is. Thank you. Thank you. Three minutes. Thank you, Your Honors. I just want to address the invasion of the rights of others colloquy that, you know, the discussion of that with relation to what was stated in Tinker really related to this conduct during the school day. And so that's what we don't have here. Is that in school or out? Your Honors, we have lots of cases in other jurisdictions, and I understand that the 11th Circuit doesn't have that yet, but JSB Blue Mountain, Layshock, Murakowski, you've got Dovey, George Mason, all of these cases involved off-campus conduct, sexually explicit nature, with profiles that were, you know, MySpace profiles, Facebook profiles, things that were viewable by others that actually were not found to be something that the school could prescribe under the First Amendment because they were protected, because there was no substantial material disruption of class, even when there were students showing up with abject terror, when there were students who felt distressed. Did the courts in those cases find that they invaded the rights of others, but it didn't matter because it happened outside school? They didn't use that language because there's different types of, the circuits treat them differently. But that's your position, I gather, right now. Yes. The point you're pressing. Yes, Your Honor. The cases, the decisions, and we'll read them, but they don't say that. Not specifically with that phrase, Your Honor. So these cases are instructive, however, and relevant because they deal with the kind of conduct involving, even with respect to Murakowski, Papish, and Dovey, George Mason. Those were college-age students. Valencia College has not cited to a single case involving a college-age student who has felt that their rights were an invasion of the privacy of their rights had been violated in this scenario because there are different pedagogical goals with respect to high school students versus college students, and that's why that wouldn't be relevant here. I would just like to also say that with respect to how far can you take the jurisdiction, the hypothetical that Your Honor had raised, the way that the policies were constructed in 2014, any conduct by somebody who happens to be a student,  taken anywhere outside of school, could potentially be a violation of the policy. That in and of itself is entirely overbroad, and it proscribes conduct that is protected by the First Amendment. And with respect to the weight of the evidence and reference that was mentioned, that was with respect to appeals only. That has no instruction as to what... Was there, when I had asked your colleague this question, was there something in the record where Sirubo had made a declaration or a sworn affidavit on summary judgment to the effect that we use the more likely than not standard? He said he did make a similar type of reference, yes, Your Honor, and he also stated that that's not in the actual policy that way. Right. The policy says nothing other than once you get to an appeal. Correct. But I'm just asking, is that what he said they used, more likely than not standard? I believe that the exact phrase was stated differently, so that wasn't... Could have been more likely than not, could have been the greater weight of the evidence, could have been preponderance, I mean, there are a lot of ways, but in some form or fashion he said that. He said the greater weight of the evidence, I believe. Okay. Thank you, counsel. We'll take that case under submission. Thank you, Your Honor. All rise.